I understand. Thank you, Your Honor. May it please the Court, Jenny Harbine for Appellant's Center for Biological Diversity, and I'll try to reserve five minutes of my time today for rebuttal. I'll start by addressing the significant portion of the range issue, and then I plan to address the Service's arbitrary finding of population increases and its dismissal of critical threats to Arctic grayling that they face from high water temperatures. At the outset, this case presents an important question about the Fish and Wildlife Service's obligation to evaluate a species' status throughout significant portions of its range under Section 1532 of the Endangered Species Act. And the crux of this issue is the meaning of the word range, which the Service restricts to mean only current range. This is wrong because the word range, as it's used throughout the Act and its legislative history, demonstrates Congress's clear intents to reference a species' entire historical range, including both occupied and unoccupied portions. So, therefore, it's your position that the range of the Arctic grayling includes areas where it's already been wiped out? That's right, within this Upper Missouri River Basin DPS. And it has been wiped out from more than 90% of the stream miles that it formerly occupied. But Congress's intent to refer to a species' entire historical range first is clear from Section 1539J of the Act, which references explicitly current range, showing that Congress knew how to limit the general meaning of the word when it intended to, and the Service's interpretation would render the word current in 1539J meaningless. Second, Congress clearly expressed its intent in using the word range in 1533C1. Counsel, I'm sorry. You said the current range would be redundant. What if it means range can either mean historic or current? So it's applicable to both. So if they want to, in a particular use, limit it down to the current range, it wouldn't be redundant. I understand that position. I don't think it's right, however, because if range means current range, as the Service suggests, then 1539J would be referencing current current range. And we presume that Congress doesn't use words that it doesn't need to use in writing a statute. And this meaning is confirmed in other places in the Act. In Section 1533C, the Service used the range, and in the legislative history said expressly, quote, range is used in the general sense and refers to the historical range of the species. Now, the same meaning must apply in 1532, not only because we presume that a term has the same meaning as it's used throughout the statute, but also because 1533C1 and 1532 use nearly identical language. So if the Service finds under 1532 that a species is endangered in a significant portion of its range, under 1533C1, it specifies over what portion of its range it's endangered. And the Service would have you read the meaning of the word range in these tandem provisions as entirely different. Let me get what bothers me or gives me some pause about your argument. So your argument works. So what you're saying is that range only has one meaning. One unambiguous meaning means historical range. And therefore, under Chevron, Chevron really doesn't apply because you've resolved it. Now, the D.C. Circuit recently said range is ambiguous and went through some of what you just said and concluded that the Service's interpretation of the word range to mean current range was reasonable. Going through there, they did their pretty good analysis. What's wrong with their – where'd they go wrong? What you're asking us to do is to reject what the D.C. Circuit did and essentially create a circuit split on the meaning of range. If it is ambiguous, then, you know, we have Chevron deference we have to deal with. Right. So where did the D.C. Circuit go wrong? So the D.C. Circuit in the Humane Society case did get it wrong, and I don't say that lightly. But the court there wasn't presented with the textual arguments, with the legislative history arguments, particularly with respect to 1533c1, that are before this court. And in addition, the D.C. Circuit wasn't operating under the cases that govern in this circuit that have already spoken to this issue. And particularly, I'm referencing the Defenders of Wildlife and Tucson Herpetological Society cases, which are both discussed extensively in the briefing. And they both say that the Service must evaluate whether a species unoccupied form or range. Is that different than saying range only has one meaning? It is different. What the Service would have you hold is that, or find, is that in Defenders and Tucson, the court found that the word range is ambiguous. But they didn't. They held that the full term significant portion of the range is ambiguous. When the court looked at the meaning of the word range, it said, okay, in Tucson, I can quote Tucson to you, the appropriate criteria for testing significance are undefined, but the Secretary must develop some rational explanation for why the lost portion of the species range are insignificant. That's at 566F3-877. Significant is ambiguous, but range is not. And the court stated in those cases that the Service must evaluate whether lost historical range is a significant portion of the range. Counsel, let me ask you a related question in my mind. Can lost historic range ever be a, quote, significant portion, close quotes, of a species range? Or would you say it always is? Or, you know, would it only be so in some circumstances? Or would the lost range never be significant? I think there are circumstances under which lost range is a significant portion of the range, and the species status there could warrant listing. Now, the Service didn't grapple with that issue here because it said, categorically, lost historical range isn't part of our significant portion of the range analysis. But if it had undertaken that analysis, what it would have done is looked at whether that lost habitat provides conservation value to the species. And the Service defines the significance by reference to the scientific principles of resiliency, redundancy, and representation. If there are attributes of that lost range that would provide conservation value to the species, then it can be a significant portion of the range warranting listing. Conservation value, do you mean, like, the species would be able to adapt and move back into that lost range if circumstances permitted it to do that? That's right, and let me provide an example from the Grayling record in particular. So there are areas of the Grayling's formerly occupied range, including segments of the Big Hole River and of Governor Creek, which is a headwater tributary to the Big Hole, from which Grayling have disappeared over the last couple decades. And this habitat was important enough that the Service had restoration efforts there and reintroduction efforts there. But when it finally came time to grant or deny protections under the Endangered Species Act in 2014, the Service didn't even consider whether those parts of the Grayling's habitat, which are still suitable by the restoration zone or by the Service's own admission, whether those areas were significant, and whether listing was warranted to offer special protections to habitat in those areas to allow for recolonization. And this Court recognized in the Gifford-Pinchot Task Force case, which is at 378 F3rd 1059, that the Act's purpose is to conserve species. And conservation doesn't mean simply maintaining whatever few individuals are left in the tiny portion of their habitat that remains. Conservation means more than persistence, it means recovery as well. And a meaningful consideration of whether lost habitat is significant would have looked to this conservation purpose. So which of our Ninth Circuit cases do you think are the best cases for you on the issue that the ESA is not just trying to protect, you know, the current living members of the species, but also to restore its range? I think the Gifford-Pinchot Task Force case, which I cited a moment ago, expresses that clearly. I think the Endangered Species Act itself, in defining conservation, embodies that concept as well. And when the service looked at, you know, they tell you, we looked at the historical range, and therefore we satisfied our obligation under defenders to consider it. But the service's consideration of historical range here begins and ends with its statement that, the effects of past range curtailment on fluvial grayling are present, but there appears to be sufficient adequate habitat remaining to support the species. That's not a meaningful consideration of historical range, it's no consideration at all. Because if the service finds, as it did here, that Arctic grayling can persist in the range where they still exist, under the service's treatment of historical range, it will never factor into the analysis. And this highlights a real contradiction in the service's position with the purposes of the Act. So if the service had evaluated whether listing was appropriate before grayling had disappeared from Governor Creek, for example, it would have considered whether threats to grayling in Governor Creek warranted listing to prevent the species disappearance from those areas. But it didn't undertake that analysis at all here. And as a result, as a species range contracts to ever smaller areas, so too do the protections afforded by the Act. And that simply can't be what Congress meant. So putting aside the range argument, you had other – I mean, if we were to disagree with you and felt like we should go along with the D.C. Circuit, you had other arguments as well that you advanced, correct? We did, and they provide independent reasons for setting aside the 2014 finding. I'll turn briefly to two of those arguments. And the first is the service's arbitrary finding of population increases in the Big Hole and Ruby River. And this issue is really important because it was really the linchpin of the service's decision not to list. And these illusory population increases were used to dismiss nearly every single threat that the service had previously identified in 2010 as warranting listing of grayling. In relying on this leery unpublished data to find increasing population in the Big Hole and Ruby Rivers, the service didn't acknowledge contrary data. That's the DeHaan Genetic Study, which documented a population decline over a period of decades through 2012 with the lowest numbers shown in that final year in 2012. And state monitoring data, which for the Big Hole River showed yearly increases and yearly decreases, but does not support the service's unqualified claim of a steady increase in that population. And for the Ruby River, the state monitoring records show an overall decline between 2009 and 2013 with population declines every year from 2010. So your point is that they just didn't account for the negative information, or for the information that's showing a decline? They didn't even mention that there was contrary information in the 2014 final year. So is their obligation they have to recognize that it exists and explain it away? Their obligation under administrative law and under the Endangered Species Act Best Available Science mandate is to acknowledge contrary information, explain why it is or isn't relevant to the service's finding. And, you know, if the service finds that that information is not credible, it needs to discredit that information on the record. Otherwise, this court can't ascertain whether or not the service acted reasonably. The second issue I want to address briefly is climate change, which is important because it will exacerbate the two most critical threats that face grayling habitat, which is dewatering and high water temperatures. The service acknowledged in its 2014 finding at ER 54 that water temperatures will increase with climate change. But they go on to cite uncertainty about how different temperature and precipitation scenarios will affect grayling. But again, and this is a theme of the 2014 finding, the service hasn't explained why that uncertainty counseled against listing rather than for protection. And that's what's required by this circuit's precedents, and particularly the Greater Yellowstone Coalition versus Servine case. But even more troubling, the studies the service cites to support its finding of uncertainty on page 35 of its brief don't leave any questions about whether grayling will face dire future conditions. The only question those studies leave is how dire it will be. So for example, one of the services studies at ER 615 acknowledges substantial decreases in habitat using only air temperature relationships. And it goes on to note that flow reductions will exacerbate stream temperature rises. So while the 2014 finding says that rising air temperatures won't have as significant an impact on grayling as other climate change effects, the science they cite says rising air temperatures alone are a substantial problem, and these other aspects of climate change will only add to that threat. So counsel, if I could ask a question on that. Is it fair to say that the Arctic grayling is a species that likes cold water, which I sort of infer from the Arctic part of its name? Not only does it like cold water, it can't survive in water above 77 degrees, and water temperatures above 70 degrees can also affect survival. And that's undisputed. The service acknowledges that in the 2010 finding, the 2014 finding. It's also undisputed that those high stream temperatures persist. Okay, so now, if that's the case, then, assuming that the globe is warming, whether it's caused by human efforts or some big cosmic picture, but if the globe is getting warmer, does that threaten the Arctic grayling? That poses a threat to Arctic grayling, particularly where the service hasn't made a priority of conserving Arctic grayling habitat in the face of those threats. What Arctic grayling need most is cold water and plenty of it, and that's what Endangered Species Act protections can get for this species. So you had one other. What was it, the genetic? You had one other argument. Yeah, the other issue. Genetic viability of the grayling, given their size. Right, the other issue that's discussed in the briefs is the service's arbitrary dismissal of threats to grayling from small population sizes. And these fall in two categories. There's the long-term genetic threats, which the service just didn't address at all in the 2014 finding, which is in contrast with what it did in 2010. And then on the nearer-term threats, the threats posed by environmental disturbances to very small populations, the service treated that issue arbitrarily as well, particularly the Ruby River population, which the service said was essential for the preservation of this species because it provides redundancy of the fluvial life history that otherwise is only present in the Big Hole River. Ruby River has 42 adult breeding fish, and the service relies on a single-year population increase under the Leary data, which occurred between 2011 and 2012, to say, okay, 42 fish mission accomplished. This is a viable population, where it previously had said we need at least 10 years of data that show increases, that show that our juvenile survival outpaces mortality in this population to find that it's viable. The service's rush to judgment in 2014 was arbitrary. I'm afraid you're over your time, and I think at the start you said you were going to try to hold five minutes for rebuttal, but we didn't do that partly because of our question. So for planning purposes, I'm going to ask the clerk to add two minutes to your clock for rebuttal, but at this point we've got to hear from the other side. Thank you. Now we'll hear from counsel for appellate. Could you remind me how you've agreed between the federal government and the state to divide? Certainly. I will be using 15 minutes, and the state will be using five. Five minutes. You're using five minutes. I'm using 15, and the state will be using five. Okay, the state's fine. Well, let me just say, if it will help for planning purposes, because I've given Ms. Harbin an extra two minutes, you can each have an extra minute. Thank you, Your Honor. Move the clock to 22 minutes. I'd say go for it. Thank you. Good morning, Your Honors. May it please the Court, my name is Tekla Hanson-Young, and I represent the Fish and Wildlife Service. I would like to use my time to address the arguments raised in the opening remarks in order. The first argument raised by the center is that the service's interpretation of range is unreasonable, but the D.C. Circuit, as Judge Pius has noted, has already answered this question with a thorough analysis, finding the term range to be ambiguous, and that the service's interpretation of range was reasonable and within permissible statutory construction. This Court should not create a circuit split on this issue and should find similarly that the service's interpretation of the term range, as referring to current range, is reasonable under Chevron. The D.C. Circuit, though, didn't address all the issues that counsel has raised in her brief. Maybe they did. I didn't look at their briefs in that case. They actually did. The D.C. Circuit went through the same statutory provisions that have been discussed in this case and found that none of those statutory provisions shed light on the meaning of the term range. How about the legislative history? The D.C. Circuit specifically stated that legislative history was not relevant, and I would like to point out that the legislative history here, that the plaintiff's cite to, refers to a different statutory provision not at issue here, and it also refers to a congressional report from 1978, which is after these definitions were defined in the original Act. So legislative history that has been generated in a subsequent amendment cannot be used to inform the definition of range in the original enactment. Also, I would point out that when a statutory term is ambiguous and the agency has exercised its discretion to interpret the statutory term, legislative history cannot be used to overrule it, and authority for that is found in this Court's decision in San Bernardino, which is at 63 F. 3rd, 883. I would also like to point out that the Supreme Court in the Yates decision, which is at 135 Supreme Court 1074, has found that the same term in a statute can be used in different ways throughout the statute. So there's no requirement that the term range be used in the same way throughout the ESA, and if this Court reads the services thoroughly reasoned policy where it has interpreted a significant portion of the range, this Court will find that the service has discussed and considered all of the statutory uses of the term range and that its interpretation is reasonable and consistent with the purposes of the ESA because it focuses the service's resources on the areas where species are most in peril, that is, its current range. Asking the way that this interpretation doesn't mean that the service doesn't ever think about lost historical range. It's extremely relevant to the service's decision because what it asks is, when looking at a species' current status, it asks, can this species survive in its current range even though it has lost all of its historical range? And what can the service do to encourage the expansion of the species outside of its currently occupied range? So the question is extremely relevant to the status of the species, and that's indicated by the service's thorough discussion of lost historical range here, and specifically what the service found in this case is that the species, though the species occupies less than 10% of its historical range, six populations occupy a representative portion of the historical range, and discussion of that is found at ER 37 and ER 69. The service also noted that reintroduction efforts in historically occupied areas have been successful and were planned to be continued through the present time and even past 2018. Discussion of that is found at ER 45 and 57 and 58. Let me ask you just one other question along this issue. So Council made reference to two of our Ninth Circuit opinions that touched on historical range. Correct. Should they inform our understanding of what the term range means now? Those decisions are helpful for this Court's understanding to the extent that both of those decisions, defenders and Tucson, found that the entire phrase is ambiguous. And having found that, this Court should then look to the service's interpretation that was promulgated after notice and comment and defer to that interpretation under Chevron. Those decisions are also relevant to the extent that they can be understood as saying that the agency needs to consider and account for lost historical range. I would like to direct the Court to page 1145, note 11 of the defender's decision, which specifically, that's 1145, note 11, which specifically found that the service in that case hadn't offered any interpretation of the statutory phrase. And so the Court was sort of looking at the various arguments presented and coming up with its own interpretation of the phrase itself. But having found the phrase to be ambiguous and with the service now having looked again at the phrase and specifically the term range and having issued a policy after notice and comment that interprets the phrase, this Court should defer to the service's interpretation of that word. Now, even if we do, Judge Fischer has a question for you. Could you respond to the argument about current being redundant? Certainly, Your Honor. If we adopt your reading? I would direct this Court to read the Humane Society D.C. Circuit's decision discussing that. I'm looking at it. And what it says is at 603, the service concluded that range refers to the species' current range at the time its status is evaluated for listing. Where do they say anything about the notion that that would be redundant? Well, I would direct you to page 604, which specifically talks about section 1539J. And in the paragraph that starts with the third place that range appears is section 1539J, the D.C. Circuit goes on to say that provision cuts both ways. On the one hand, it could be argued that if range already means current range, then the addition of current would be redundant. On the other hand, the use of current range could also be read to corroborate the service's view, since current range in 1539J may refer to the listed range of the endangered or threatened species. So the D.C. Circuit found that 1539J is not dispositive of the meaning in 1532, which is at issue here, and really just suggests that the phrase, that the term range in 1532.6 and 20 is ambiguous. And in that case, this Court should defer to the service's reasonable interpretation of it under Chevron and avoid creating a circuit split on this issue. Okay. Thank you. She had other arguments. Yes, even if. Even if. Even if. Well, I'd like to address those, too. The first argument concerns the service's findings that the Big Hole River and Ruby River populations were increasing. And I would first like to say that the service's decision that listing is not warranted at this time was really based on not just population information, but other information as well about habitat improvement projects. But specifically, what the agency found is that 19 of the 20 populations are either stable or increasing, and 18 of these populations are located on federally protected land. There are two fluvial populations in the Big Hole River and the Ruby River, and recent genetic information from 2014 showed that those populations were increasing. Now, the use of genetic data to infer population sizes is an accepted method, and the service relied on that method in its finding, its 2014 finding, to determine that those two populations were increasing. The center points to, sort of not satisfied with the service's explanation of its population finding in the record, the center points to the DeHaan study to sort of undermine the service's reliance on the Leary study. The DeHaan study actually is not inconsistent with the Leary study, though. DeHaan looked at climate change and grayling specifically, the impacts of climate change on grayling, and what it found, there's some particularly important language at ER 338. What DeHaan found, or what he did, actually, was take four samples of grayling over four different decades, one sample per decade, starting in the 1980s and ending in 2011-2012. And what he found was that the population in the Big Hole River had been declining since the 1980s, but stabilized since 2000. Now, the last sample that he took was in 2011-2012, and the Leary study picked up where DeHaan leaves off, and specifically looked at the question of whether grayling populations are increasing. And Leary looked at annual data from 2007 through 2013 for every year, and sampled the genetics of the fish, and found that populations were actually increasing. So those two studies are not inconsistent. And the agency admittedly did not go into the details to explain why these two studies are not inconsistent in its finding, but it didn't need to, because in its view, the studies are consistent, and it used the studies where they are most appropriate. So for Leary to show that the populations are increasing, and for DeHaan to discuss the impacts of climate... What was the Leary study? Was that a... The Leary study is unpublished, and it is in the record at...I'm sorry, I don't have the record site handy, but I think it's around ER 300, in the 300s. And it was a presentation, it was unpublished data, and it was discussed and presented at a workshop, the notes for which are found at around ER 260. And then the service used that information and explained it in its 2014 decision. Now, I would say that it would be nice... I mean, it was a presentation, right? Well, it was more than just a presentation. It was the actual information that Leary used. And I would say, yes, it would be nice if Leary had written up his graphs in text for us to review and understand better. But the service was under an obligation to make its decision within a certain time frame as a result of multi-district litigation, and to resolve the backlog in the Fish and Wildlife Service's listing decision. So in an ideal world, with infinite agency... That's the one thing that sort of troubled me here, is that, you know, in 2010, they said some pretty... Some things would really suggest that if they had done a careful analysis, they would have listed the grayling. And it's really interesting that within four years, everything switched. And that change in decision is justified by the record and the new genetic information that the service took into account in 2014 that was not available in 2010. Also, the service in 2014... I mean, one large distinction is that in 2010, the service didn't have genetic information to determine the conservation value of the different grayling in the Upper Missouri River. So it only determined that five populations had conservation value. In 2014, genetic information showed that there were 20 populations with conservation value. In 2010, the Ruby River population had just started to show some natural reproduction. By 2014, the service found that natural reproduction had been occurring for several years in the population... I thought there was some criteria that the service looks at when looking at genetics, and that is you look at it over a period of time. That's correct. And it was like a 10-year standard, if I'm not mistaken, that they like to look at this kind of data over extended time. And here, it was just a couple of years. Well, I think what you might be referring to is the 2010 discussion that ideally there would be 10 years. We needed 10 years of information on Ruby River. You just couldn't do that under the circumstances. Is that what you're saying? Well, what the agency did is look at the information that it had available in 2014 and determined that it did, in fact, have enough to decide that the Ruby River population was viable and self-sustaining, given the fact that the genetic information showed that there were an increase in both breeding fish and effective population size, and that there were documented instances of natural reproduction, and that fish were now in 40 miles of the historically occupied habitat. And remember, this population, the Ruby River population, is a completely reintroduced population that was not in the Ruby River prior to 2006. So the only reason why the Ruby River population is there currently is because extensive conservation efforts had been made over the past several decades to get it there and get it self-sustaining. And so that information was not available in 2010 when the service issued its 2010 warranted but precluded finding. The agency reasonably considered that information in its 2014 finding. I'd like to briefly address the Montana Fish Catch information to say that the Fish and Wildlife Service used this information to correlate its population findings, but it didn't rely exclusively on this information where it had the better, more reliable Leary data available to it. I would like to briefly address the service's findings on climate change and to say that under the Center's view, or adopting the Center's view, really the service would be bound to list all Arctic species because of evidence that the climate is warming. And the fact is not all Arctic species will respond to climate change in the same way. And the agency needs to be careful about which Arctic species it lists, taking into account the individual circumstances of each species. And here, what the information in the record showed is that habitat was improving for these grayling. There were extensive habitat restoration projects that were undertaken in the Big Hole River and continue to be undertaken that reduced water temperatures extensively over the last decade. And yes, there are still some days with warmer weather, but the overall number of days with warmer weather have declined dramatically. And it's also important to note that the warmer weather, or the warmer water issue, is not a sort of trigger for fish kills. When water temperatures hit 70 or even 77 degrees, what the 77 degree mark means is that if it's 77 degrees, 50% of studied fish do not survive for longer than a week. What percentage was that? 50%. Thank you. Don't survive for longer than a week. So if you have one day where one portion of the main stem is reaching 77 degrees, it doesn't mean that all of the fish there are going to die. And the fact is what the evidence showed is that water temperatures are decreasing as a result of habitat improvement projects. And that information was reflected in the DeHaan study, which is the only study that the service considered that actually looked at grayling in Montana and the relationship to climate change. And that study found that grayling in Montana respond differently. So the Big Hole River population showed some evidence of decline, although other measures for the Big Hole River population showed stable populations, or a population that had become stable. And the other population that DeHaan studied, which was the Centennial Valley population, showed an increasing population even though air temperatures were increasing. So I have a question. Stacey, did you already add the extra? Mm-hmm. Did I mean to? Thank you. So how much time would you like the state of Montana? I would like them to have the rest of my time, unless this Court has any other questions. You made a very nice argument. Thank you. Thank you very much. Any questions of counsel? No. Or Judge Paz? No. Thank you. Thank you, Your Honors. Thank you. May it please the Court, good morning, Bill Schenck, attorney for the Department of Fish, Wildlife, and Parks in the state of Montana, with me in the courtroom, co-counsel Zach Zipfel. Your Honors, the state of Montana wants us to make three very simple points this morning. First of all, these conservations efforts by the state of Montana and its many partners, they're out there, they're prolific. We're working very hard to conserve this species, and we have been for many years. Extremely important point to be made under here is that it's not only that our partners in this are not only the state, FWP, other state agencies, the U.S. Fish and Wildlife Service, it's also NGOs, and most importantly, it's private landowners. You have heard today the emphasis on the Big Hole River and that population amongst all the populations, the 20 that are out there. That emphasis is there. It's there in the 2014 finding. It is an important population. Why is that such an important population? Because it's a representative of one of two fluvial populations. There are many of them that are adfluvial. Those adfluvial populations are also important. The service found that they have conservation value. They are in lakes. Some of those have populations of individuals that are several thousand, and some of them are smaller. But good conservation of the Arctic grayling in the upper Missouri DPS, Montana, is dependent upon also the fluvial populations. We've met that. In the Big Hole, we are working extensively. Candidate Conservation Agreement with Assurances, this is now covering over 50% of the eligible ground in the Big Hole Valley with many, many participating landowners, private landowners. It is difficult. It is a lot of work to get these people involved in this and to buy into this. And when you do, it is vital that they stay that way. And there have been improvements. The state of Montana is working on these things. It is our people who go out under the CCAA, work on the individual agreements with the landowners, and once one's in place, are working with them to bring the funding to bear and get these projects going on the ground. Why would listing sort of – if they were listed as a threatened or endangered species, why would that impact the conservation efforts that the state's undertaking? The state of Montana would remain committed. Indifferent, right? Is it indifferent? No, it's not indifferent. Well, first of all – You don't want them listed. We'd rather not have them listed under these circumstances because – Just I'm talking about the general, you know, what you're talking about, this conservation effort. Why not? Well, one thing is keeping the faith and the buy-in from our private landowners. And this is not ideological. Are you glad that they're not going to buy in? We don't know that. We don't know that. We've been working with them extensively, and what they are working toward is a conservation of this species. And make no mistake, the ESA is scary for these people. It really is. But we have got things going in a good direction out there. And this is the ESA at work. This was my third point. The ESA at work, and this is ESA success without the need for listing. We get so focused on listing or delisting and whether we should do that or whether we should not. But the effort to get this listed started many, many years ago. And in response, you have the service and you have the states and you have many partners working to conserve this species. And it is paying off. We've been talking about habitat improvements. We've been talking about population. And I know that we can nitpick at individual data points. But the fact is we've opened up more habitat to these fish. We have overall improving temperatures. That means decreasing temperatures in the Big Hole and its tributaries. We have a Ruby River population. We're focused on population size there. That's the wrong focus. That is a replica now, a genetic replica of the Big Hole population. Those Big Hole fish, they were created a genetic reserve. Those reserves went into establishing that Ruby River population. And the sheer number of fish in it is not the important point. The important point is, is that for many, like five, six years in a row now, it's been found to be self-replicating. I mean, it is its own small population now, and it's providing that replicate of the Big Hole. These efforts – This is in the Ruby River? In the Ruby River, Your Honor. That's correct. Yeah. So these conservation efforts are working. They're doing so with multiple partners, which is vitally important. And what it says is the ESA, in this case, is working without the need for listing this species. Not here. Not now. It doesn't mean that it can't be reconsidered in the future. We don't know what that holds. We know that we're doing a good job. We know that we're having a positive impact. Great. Thank you, Mr. Shea. Is there – you're over time, but is there anything else you'd like to say in wrapping up? Well, if you have no questions – further questions for me, I think I've said enough. Thank you very much for your attention. Okay. Thank you. Glad to hear about those good conservation efforts. Thank you, Your Honor. Yeah. Thank you. I'll address first the government's argument that the meaning of the word and the legislative history doesn't bear on this. First, I'll point out that it's the court's role to make sense, not nonsense, of the statutory scheme, and that includes making sure that the term range has a consistent and sensible meaning throughout the statute. And the legislative history of 1533c1 is not subsequent legislative history. It was concurrent with amendments to that section, and it's instructive to Congress's intent with respect to c1. I'll also address the point that the Humane Society Court didn't evaluate legislative history. In footnote 8 to that case, the court says expressly that no party brought any legislative history to its attention. But even if we're in Chevron Step 2 and the meaning of the word range were ambiguous, the court still can only defer to reasonable interpretations of words. And I'll note that Tucson Herpetological was a Step 2 case, and in that case the court still said that the Fish and Wildlife Service must evaluate whether unoccupied portions of a species form or range is significant. With respect to population increases, the state says population size in the ruby is irrelevant, but the service said in 2010 that viability of that population is essential. And to respond to Judge Pius' question, the Leary data are shown at 279 and 290 of the record, and I'll point you particularly to page 290, which documents the three years of population data that the service relied on for the ruby, which shows a single-year increase followed by a decrease in 2013. Counsel, I'm afraid your extended time is now up. Okay. I appreciate your time, and we ask that the 2014 finding be set aside for the service to grapple with these threats to grayling. Thank you. Many thanks. Then let's judge Fisher or Judge Pius. No, thank you to your counsel. With that, we'll wrap up the arguments. I want to say again how much our panel appreciates the learned, skillful, and helpful arguments from all the parties. You've all done an excellent job. It's appreciated by us, and this case shall be submitted, and the court will issue an opinion at some point in due course. With that, I think we've covered the day, so the court will adjourn until tomorrow, or recess until tomorrow. Thank you.
judges: Fisher, Gould, Paez